Filed 6/3/16  P. v. Webster CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID EUGENE WEBSTER II,<br><br>Defendant and Appellant. | F069405<br><br>(Super. Ct. No. BF140227A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer and Gary T. Friedman, Judges.†

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Ryan B. McCarroll, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

†      Judge Brehmer presided over appellant's first trial and sentenced him on counts 3 and 4.  Judge Friedman presided over appellant's second trial and sentenced him on counts 1 and 2.

## INTRODUCTION

In his first trial, a jury convicted appellant David Eugene Webster II of two counts of residential burglary (Pen. Code, § 460, subd. (a);[1] counts 3 & 4), but were hung regarding murder (§ 187, subd. (a); count 1) and a third count of residential burglary connected to that homicide (§ 460, subd. (a); count 2).  The court declared a mistrial regarding counts 1 and 2.  A second jury found him guilty of first degree murder (§ 187, subd. (a); count 1) and the related residential burglary (§ 460, subd. (a); count 2).  Appellant received a determinate prison sentence of seven years, four months and an indeterminate sentence of life in prison without the possibility of parole, plus one additional year.

On appeal, appellant contends the evidence was insufficient in the first trial for conviction of residential burglary in count 4.  He also asserts the trial court prejudicially erred in the second trial in instructing the jury with CALCRIM No. 361.  We affirm.

## BACKGROUND

### I.   Trial Facts.

#### A.   Prosecution's case.

##### 1.   The King burglary (Count 4).

On December 29, 2011, the back door of Monik King's house in Bakersfield was forced open with an apparent crowbar when she was not home.  A gaming system, a flashlight, two jewelry boxes, jewelry, a house key and a mailbox key were taken.  King's house was ransacked.

##### 2.   The Licastro burglary and murder (Counts 1 and 2).

On January 16, 2012, 92-year-old Joseph Licastro was awakened very early in the morning by a crash that seemed to originate from the kitchen.  He heard "clumping" footsteps.  Due to his health, Mr. Licastro was unable to get out of bed quickly to

---

[1]   All future statutory references are to the Penal Code unless otherwise noted.

investigate. He retrieved an unloaded pistol from his nightstand drawer and remained on his bed, pointing the pistol toward the doorway. At some point, an intruder entered the doorway to his bedroom. Mr. Licastro only saw a dark outline and could not identify the intruder, who looked in Mr. Licastro's direction. The intruder turned and left. After some time, Mr. Licastro went down the hallway to investigate.

Mr. Licastro's 84-year-old wife, Margy Licastro, normally slept in a separate east bedroom which had a window looking into the backyard. Mr. Licastro slept in a west bedroom toward the front of the house. He could not recall if he checked on her when he left his bedroom to investigate. The Licastros' burglar alarm keypad was normally located on a wall next to the residence's back door. Mr. Licastro found it ripped from the wall and lying on the floor. In the kitchen, he saw a knife with a bent blade on the drain board. He summoned police.

Mr. Licastro told the responding officers that his wife was asleep. Officers found the back door open, but the back exterior screen door was closed. The home did not appear ransacked. In the kitchen, the officers inspected the bent knife, which had hair and blood on it. An officer checked on Mrs. Licastro, and found her deceased in her bed. The cause of death was ruled a homicide as the result of multiple stab wounds, one of which severed the jugular vein. Blood was seen on and around her body. No bloody footprints existed. Other than the knife in the kitchen, blood was not discovered elsewhere in the residence. A left-handed glove and a knife were discovered in the backyard. The knife in the backyard was the same brand as the knives in the Licastros' kitchen.

On the morning of the murder, Donna Lusich received a telephone call around 4:00 a.m. informing her that the alarm at the residence of her mother (Mrs. Licastro) and stepfather (Mr. Licastro) had been activated. Lusich told the alarm company to disregard the alarm because Mr. Licastro often accidentally set it off in the night. Around 5:30 a.m. her mother's neighbor telephoned and instructed Lusich to come over right away. After

3.

law enforcement finished, Lusich and other family members entered the residence. No items in the house appeared missing.

The Licastros normally kept a key in an electrical box in the backyard. The box was located near Mrs. Licastro's back bedroom window and close to the rear door, which the key accessed. The key was observed in the box on January 14, 2012. After the homicide, the door to the electrical box was found partially open, which was unusual, and the key was missing.

### 3. The Mendoza burglary (Count 3).

On January 16, 2012, while officers were still at the Licastro residence investigating the homicide, police were notified of a possible residential burglary in progress about one block away. This call occurred approximately 60 to 90 minutes after officers responded to the Licastro residence. Officers ran from the Licastro residence to the scene of the suspected ongoing burglary, which took about 90 seconds to reach. Once there, officers were told that a suspect was inside a detached apartment that belonged to Pauline Mendoza. An officer looked inside a window to that building and observed appellant. Police entered the building and detained him. He was wearing a red puffy jacket and a dark-colored T-shirt. He did not have any blood on him or on his clothes. No blood appeared in the apartment. No signs of forced entry were present.

Police searched appellant, finding a right-handed glove, four keys, a small amount of marijuana, a birth certificate belonging to Mendoza, some jewelry, a cell phone and two flashlights. Appellant said he had permission to be in the residence and he was watching it for the homeowner, who gave him keys. Police determined that appellant did not have permission to be there and he was arrested. Following his arrest, he told police a pastor gave him the keys but he was unable to give identifying information about the pastor. He also told police he did not have any gloves in his possession when he was arrested.

4.

### 4. Forensic evidence.

Appellant's DNA was a statistical match to the primary DNA profile developed from a swab taken from the exterior of the rear doorknob at the Licastro residence. In addition, appellant's DNA was a statistical match to the primary contributor DNA taken from the interior of the left-handed glove found in the Licastro backyard. That glove also contained a minor portion of contributing DNA from at least two other unknown people. No evidence was introduced establishing the presence of appellant's DNA inside the Licastro residence.

### 5. Law enforcement connect the crimes.

Police determined a key found on appellant matched the lock to the back door at the Licastro residence. The right-handed glove found on appellant was similar to the left-handed glove located in the Licastro backyard. Although they were not a matched pair, both gloves were "winter" types and close in color. Appellant resided 0.2 of a mile from the Licastro residence. The Licastro residence was 0.1 of a mile from the Mendoza residence.

Police showed King two keys, some jewelry and a flashlight recovered from appellant. King identified the items as her property. One key operated her house door and the other key operated her mailbox.

## II. Defense evidence.

### 1. Appellant's testimony.

Appellant testified on his own behalf in both trials. He denied ever being inside the Licastro residence or committing the murder, but admitted he was a petty thief. He admitted burglarizing the Mendoza residence, but denied burglarizing the King residence. He claimed he found King's jewelry inside the Mendoza residence. He said he found the keys in alleyways, trash cans or dumpsters. He stated he kept keys to increase the weight of cans he was going to recycle.

5.

On cross-examination, appellant said he could not remember being in the Licastro backyard, but admitted he had been in yards to steal recyclables and must have been in the Licastro backyard once. He explained he must have tested the Licastro back door in the past, which is why his DNA appeared on that doorknob. He said he found the keys in a dumpster "in a purse or something." He admitted telling multiple lies to police about how he possessed the keys, including a lie that an owner gave him keys and another lie that a pastor gave him keys. He admitted that he did not tell police he found the keys in a dumpster. Appellant said he misplaced his other glove while searching through items in the Mendoza residence, and he denied that the left-handed glove found in the Licastro backyard belonged to him. When asked why his DNA was on that glove, appellant said it was not his glove and he did not know.

**2. Forensic evidence.**

Suzanna Ryan, a forensic DNA consultant, testified for appellant. She agreed that appellant's DNA was on the Licastro doorknob and inside the glove in that backyard. She opined the DNA on the back doorknob was not properly amplified so the results could have been inadequate for proper interpretation to help include or exclude a person. According to Ryan, appellant either touched that doorknob or he touched someone else who then touched that doorknob.

## DISCUSSION

**I. Sufficient Evidence Supports The Conviction In Count 4.**

Appellant asserts the evidence was insufficient to support his conviction of residential burglary in count 4 (King's residence).

**A. Background.**

In the first trial, the court instructed the jury with CALJIC No. 2.15 as follows:

> "If you find that [appellant] was in possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that [appellant] is guilty of the crime of residential burglary.

"Before guilt may be inferred, there must be corroborating evidence tending to prove [appellant's] guilt. However, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt. As corroboration you may consider the attributes of possession, time, place, and manner that [appellant] had an opportunity to commit the crime charged, [appellant's] conduct, his false or contradictory statements, if any, and any other evidence which tends to connect [appellant] with the crime charged."

## B.    Standard of review.

For an appeal challenging the sufficiency of evidence, we review the entire record in the light most favorable to the judgment to determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt based on substantial evidence that is credible and of solid value. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We are to presume the existence of any fact the jury could have reasonably deduced from the evidence in support of the judgment. In doing this review, we neither reevaluate a witness's credibility nor reweigh the evidence. If the jury's findings are reasonably justified by the circumstances, we will not reverse a judgment simply because the circumstances might also reasonably show a contrary finding. (*Ibid.*)

We are not required to ask whether we believe the trial evidence established guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) Rather, the issue is whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence favorably for the prosecution. (*Id.* at p. 576)

## C.    Analysis.

Appellant contends nothing established his presence inside the King residence or his intent to enter that structure. He asserts too much time passed for an inference to be drawn that his possession of King's property established guilt for that burglary. He maintains the King burglary was very different from the Mendoza or Licastro burglaries, precluding a "signature modus operandi" linking them together. He argues no rational

trier of fact could have found the essential elements of this crime beyond a reasonable doubt. We disagree.

The crime of burglary requires "an entry into a specified structure with the intent to commit theft or any felony. [Citations.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 170-171.) Possession of stolen property by itself is insufficient to permit an inference that a defendant is guilty of any offense without some corroborating evidence. (*People v. Moore* (2011) 51 Cal.4th 1104, 1130.)

"CALJIC No. 2.15 is based on the long-standing rule allowing a jury to infer guilt of a theft-related crime from the fact that a defendant is found in possession of recently stolen property when such evidence is accompanied by slight corroboration of other inculpatory circumstances tending to show guilt. [Citation.]" (*People v. Rogers* (2013) 57 Cal.4th 296, 335.) A defendant's false statements regarding stolen property may be used to corroborate an inference of guilt, and a conviction for burglary can be supported from possession of recently stolen property along with a false explanation. (*People v. McFarland* (1962) 58 Cal.2d 748, 754.)

No specific authority exists defining how recently the property must be stolen or what time intervals can properly be construed as recent. (*People v. Anderson* (1989) 210 Cal.App.3d 414, 421.) The passage of time and whether that tends to show guilt is a question for the jury. (*Id.* at p. 422.) However, possession within four and a half months and possession within approximately one month have been upheld as leading to an inference of knowledge that property was stolen. (*Ibid.*)

The parties dispute whether or not the King burglary was similar to the Mendoza burglary. Appellant contends reliance on any alleged similarities between the burglaries would amount to conviction based on propensity evidence. We need not, however, resolve that issue because other sufficient evidence exists.

Appellant was taken into police custody on January 16, 2012, inside the Mendoza residence while in possession of keys, a flashlight, and some jewelry which were taken

8.

from the King residence on December 29, 2011. Appellant claimed he found King's jewelry in the Mendoza residence. He lied to police, saying the property owner gave him keys and later saying a pastor gave him keys. At trial, appellant gave another story and said he found keys in alleyways, trash cans or dumpsters. On cross-examination, he clarified keys were found "in a purse or something" inside a dumpster. Appellant admitted he never told police he found keys in a dumpster.

Appellant possessed King's property less than three weeks after that burglary. His explanation lacked any credibility that he found King's jewelry in the Mendoza residence. In addition, his inconsistent statements regarding the keys corroborated an inference of guilt. Based on this record, substantial evidence established appellant's guilt for burglary of the King residence beyond a reasonable doubt. Accordingly, appellant's conviction in count 4 will not be reversed.

## II. The Trial Court Did Not Err In Instructing With CALCRIM No. 361 And Any Presumed Error Was Harmless.

Appellant asserts that the trial court prejudicially erred in instructing the second jury with CALCRIM No. 361. He contends his convictions in counts 1 and 2 must be reversed.

### A. Background.

At the jury instruction conference for the second trial, the prosecutor requested CALCRIM No. 361, explaining it was relevant because appellant provided inconsistent answers for the glove found in the Licastro backyard and the keys. The trial court also noted that appellant did not explain why his DNA was in that glove.

Defense counsel objected, contending appellant explained where he found the keys, answered why his DNA was on the back doorknob, and said he did not know why his DNA was in the glove. Defense counsel argued CALCRIM No. 361 was not appropriate and would lower the prosecution's burden of proof. The trial court determined the instruction was appropriate.

9.

During the second trial, the court instructed the jury with CALCRIM No. 361 as follows:

> "Now, if [appellant] failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove [appellant] guilty beyond a reasonable doubt. If [appellant] failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

**B.      Standard of review.**

An independent or de novo standard of review is used to assess whether a jury instruction correctly stated the law or removed an issue from the jury's consideration thereby effectively directing a finding adverse to the defendant. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

**C.      Analysis.**

**1.      The trial court properly read CALCRIM No. 361.**

Appellant argues he either explained or denied all evidence and questions posed to him by the prosecutor on cross-examination so that reading CALCRIM No. 361 was error. We disagree.

"CALCRIM No. 361 is similar in content to CALJIC No. 2.62." (*People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066 & fn. 1.) For this instruction to be proper, the prosecution must have presented facts or evidence within the defendant's knowledge which he or she failed to explain or deny. (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469 [analyzing CALJIC No. 2.62].) "A contradiction between the defendant's testimony and other witnesses' testimony does not constitute a failure to deny which justifies giving the instruction. [Citation.]" (*People v. Lamer, supra,* 110 Cal.App.4th at p. 1469.) Moreover, this instruction is not warranted when a defendant offers an explanation that is improbable. (*People v. Kondor* (1988) 200 Cal.App.3d 52, 57

10.

[analyzing CALJIC No. 2.62].) A failure to recall specific details also precludes the giving of this instruction. (*People v. Roehler* (1985) 167 Cal.App.3d 353, 393.)

Here, appellant failed to explain why his DNA was inside the glove found in the Licastro backyard, other than to say he did not know why it was there and it was not his glove. Under the circumstances, appellant could have been expected to provide an answer. Facts were presented within his knowledge, for which he failed to explain or deny. Thus, the trial court did not err when reading CALCRIM No. 361 to the jury. In any event, we also conclude that the reading of CALCRIM No. 361 was harmless.

### 2. Any presumed error was harmless.

Appellant acknowledges that an irrelevant or inapplicable instruction is generally a technical error not requiring reversal. (*People v. Cross* (2008) 45 Cal.4th 58, 67.) The Attorney General asserts it is appropriate to use the state standard of review under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [whether it is reasonably probable a more favorable result to the defendant would have occurred in the absence of the error]. Appellant concedes *Watson* is generally appropriate for this type of instructional error. However, he insists a federal constitutional error occurred such that the prejudice must be reviewed under *Chapman v. California* (1967) 386 U.S. 18, 24 [whether it appears beyond a reasonable doubt that the error did not contribute to the verdict]. We need not resolve the parties' dispute because, under either standard, any presumed error was harmless.

First, neither CALCRIM No. 361 nor CALJIC No. 2.62 deprive a defendant of due process. Neither instruction denies a presumption of innocence, raises a presumption of guilt, or reverses or lightens the People's burden to prove the defendant's guilt beyond a reasonable doubt. (*People v. Saddler* (1979) 24 Cal.3d 671, 679-680 (*Saddler*) [considering CALJIC No. 2.62]; *People v. Rodriguez, supra,* 170 Cal.App.4th at pp. 1066-1067 [considering CALCRIM No. 361 and following *Saddler*].)

Second, "we evaluate the impact of CALCRIM No. 361 in the context of the instructions as a whole, starting with the carefully constructed internal balance to No. 361 itself. CALCRIM No. 361 does not direct the jury to draw an adverse inference. It instructs the jury that failure to explain or deny *alone* is not a sufficient basis upon which to infer guilt, and it highlights the prosecution's burden to prove guilt beyond a reasonable doubt. [Citations.]" (*People v. Vega* (2015) 236 Cal.App.4th 484, 502-503, italics in original.) Ultimately, it is for the jury to determine the "meaning and importance" of any failure to explain or deny. (CALCRIM No. 361.)

Third, the court provided the second jury with additional instructions which lessened any prejudicial impact CALCRIM No. 361 might have caused. With CALCRIM No. 200, the jury was advised that not all instructions may apply, depending on the jurors' findings about the facts of the case, and they were not to assume the court was suggesting anything by giving a particular instruction. With CALCRIM No. 220, the jury was instructed regarding the People's burden of proof beyond a reasonable doubt and that appellant was presumed innocent. With CALCRIM No. 224, the jury was instructed it must be convinced beyond a reasonable doubt the People had proven each fact essential to each conclusion when relying upon circumstantial evidence. With CALCRIM No. 362, the jury was instructed to determine if appellant made a false or misleading statement before trial and, if so, to decide its meaning and importance.

Finally, during closing arguments, the prosecutor did not mention CALCRIM No. 361. The prosecutor did not urge the jury to find appellant guilty based on his inability to explain or deny adverse evidence against him.

Appellant's DNA was discovered on the Licastro back doorknob and inside a glove located in that backyard. He was taken into police custody near the homicide scene about 90 minutes after police responded to the homicide, and he had a key to the Licastros' back door. He gave conflicting explanations regarding how he possessed keys found on him, and he admitted to the jury that he lied to police about the keys. Given this

record, even assuming error occurred in giving CALCRIM No. 361, the error was harmless. It is beyond a reasonable doubt that a more favorable result for appellant would not have occurred had this instruction not been given. Accordingly, counts 1 and 2 will not be reversed for alleged instructional error.

## **DISPOSITION**

The judgment is affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
FRANSON, J.


_____
SMITH, J.

13.