Filed 4/6/21  P. v. Moisa CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHN MOISA IV,<br><br>    Defendant and Appellant. | F077818<br><br>(Super. Ct. No. PCF287834)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Antonio A. Reyes, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Dina Petrushenko, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

A jury convicted defendant John Moisa IV of first degree murder with a firearm enhancement after he repeatedly shot at an individual outside of a party.  The victim

suffered six gunshot wounds and died as a result of the shooting. At trial, defendant testified on his own behalf that the victim pulled something from his waistband defendant believed to be a gun or knife; defendant feared for his life and shot him. Defendant admitted lying to police after the incident and denying he fired the gun or knew who committed the shooting. However, as the questioning progressed, he told the police he had lied and admitted to the shooting.

In multiple issues on appeal, defendant argues: (1) the court erred in admitting gang evidence because it was irrelevant and more prejudicial than probative; (2) the court prejudicially erred in instructing the jury with CALCRIM No. 371 regarding adoptive admissions and (3) with CALCRIM No. 361 regarding the failure to explain or deny adverse testimony because the instructions were unsupported by the evidence and violated defendant's due process rights; (4) the cumulative effect of these errors resulted in a violation of defendant's due process rights; (5) he should be entitled to remand for the court to strike certain fees and stay certain fines imposed at sentencing until an ability to pay hearing is held; and (6) the court abused its discretion in failing to strike his firearm enhancement or, alternatively, it should be given the opportunity on remand to consider imposing a lesser sentence under Penal Code[1] sections 12022.53, subdivisions (b) or (c) in lieu of the life term imposed under subdivision (d).

We affirm the judgment.

## FACTUAL BACKGROUND

Defendant shot the victim, Wallace Varela, in the early morning hours of August 25, 2013. At trial, the prosecution argued the shooting was premeditated and that defendant had the intent to kill. The defense argued defendant shot the victim in self-defense.

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

2.

## I.    Prosecution

On August 25, 2013, Alberto S. and his brother, Wallace, went to a party in Lindsay at around 9:00 or 10:00 p.m.  They were there for about 30 minutes and the police arrived.  Alberto and Wallace then left the party and went to their cousin's house.  Their other cousin Mark heard about another party in Porterville; Wallace, Alberto, and Mark decided to go.  As they were entering the house, an individual standing outside asked Mark about his hat, which made Mark uncomfortable.  When they were inside the house, Alberto saw nine people in the living room who Alberto described as having the "demeanor" of "gang bangers" based on the way they talked, dressed, and acted.  Defendant was among those nine people.

Alberto and Wallace walked in and sat down at the kitchen table where there was another male whom Alberto spoke to before the male glanced at the individuals in the living room and walked away.  Alberto was nervous and Wallace told him, "let's leave, let's leave."  Mark had left at that point.  Defendant was staring at Alberto and Wallace and "being real friendly."  Defendant hunched over from a standing position and told Alberto, "Hey, don't choke on that cap of your beer," because the cap of Alberto's beer was missing.  Alberto thought the comment was odd.  Defendant just stood there staring at Alberto and Wallace, and Alberto told Wallace, "let's go."  They were in the house for a total of 15 to 20 minutes.

The party host, Amy P., testified the vibe at the party was initially "normal" but she too acknowledged towards the end people, including herself, became uncomfortable and wanted to leave.  She testified she felt uncomfortable because she believed some of the men at her house were gang members.

Alberto and Wallace then walked out the front door and closed it behind them.  They walked side by side down the sidewalk to the road and then Alberto heard a spark that sounded like a firework behind them.  According to Alberto, he jumped to the right, looked back, and saw "the defendant emptying the clip into [his] brother."  Defendant

3.

was about 14 feet away. Alberto denied that Wallace reached for his waistband as they were walking out. He testified defendant shot Wallace in the back; Wallace spun around, fell, and tried to get back up. Amy reported to police she opened the front door and saw defendant with his arms outstretched; she noticed he had a handgun in his hand when he turned and ran away. She identified defendant's photograph in a photographic lineup after the incident.

Alberto tried to chase defendant, but defendant was too fast. Alberto then went back to Wallace who was "face down with his back in the air like he was trying to get up." Alberto flipped Wallace onto his back. He denied removing anything from Wallace's person or that Wallace had a weapon that night. Alberto also denied that he had a weapon that night. Approximately five minutes later, Alberto's cousin arrived. Wallace was unconscious at that point; Alberto was holding Wallace's wounds.

Officer Michael Gray responded to the scene at around 2:00 a.m. He saw Wallace lying on the ground and a group of people standing nearby. Wallace's clothes were bloody and his breathing was labored. Alberto was angry and yelling at Wallace to get up. Alberto would not let Gray get near Wallace, and Gray was concerned with engaging with Alberto in light of how upset he appeared. Gray saw a family member roll Wallace over onto his back from a fetal position and Gray saw holes on Wallace's body where his shirt pulled up. Gray did not notice anything in Wallace's waistband. The police did not recover any weapons from the scene.

The forensic pathologist who conducted an autopsy on Wallace's body testified he observed seven gunshot wounds on Wallace's body. There were two "entrance wounds" on Wallace's back and one in his buttocks. There was also an entrance wound and a graze wound on the front side of Wallace's body. There was also an entrance and exit wound on Wallace's right arm caused by one bullet.

4.

## II.    Defense

Defendant testified on his own behalf. He recalled arriving at the party in Porterville with five other people. There were already a few people at the party, but Wallace and Alberto had not yet arrived. At the time, defendant did not know Wallace or Alberto. Defendant walked around and shook hands with people and introduced himself upon arriving.

He recalled speaking to Alberto at one point. He explained Alberto and Wallace were disconnected from the rest of the party; everybody else was in the living room sitting on couches. So, defendant spoke to Alberto in an effort to break the ice and bring the groups together. Alberto had grabbed a beer and defendant told him, "If that's not your beer watch out because the caps broken and it might be inside the beer just so you don't choke on it when you drink." He denied trying to start a fight or speaking with animosity when making the comment. He also recalled asking Wallace if he was "high," and Wallace nodding in response.

Defendant was with his brother Dallas during the entire party. He recalled Dallas giving mean looks to Wallace. Defendant testified there was a verbal altercation during the hour or two he was inside the party. The altercation occurred between Dallas's friends and Wallace. Someone asked Wallace where he was from and if he was "a homie," and Wallace responded with "disrespectful" comments towards Dallas's friends. According to defendant, Wallace said, "I don't do that buster shit," which offended Dallas and his friends. Dallas told Wallace, "Hey, he just asked you a question, not to get crazy with him." Wallace then "jumped up and sa[id], 'What mother fucker' " to Dallas. According to defendant, he then jumped in front of Dallas, between him and Wallace, and said, "Nobody is going to lay hands on my brother." Wallace then said to defendant, "Let's go outside." Defendant told Dallas to stay inside, and he complied.

Defendant then went outside with Wallace to confront him for being disrespectful to Dallas. Wallace and Alberto walked out of the house first. They walked into the street

5.

and were about 12 to 15 feet from defendant. Defendant then heard Wallace yell, "Hey, come here," and Wallace ran towards defendant. Defendant testified he saw Wallace holding his waistband; defendant saw something in Wallace's waistband with a brown handle but could not tell if it was a gun or a knife. Defendant thought Wallace was reaching for a weapon and he believed he was in danger; he testified he saw Wallace's hand on the handle. Defendant had a .32-caliber revolver with him that night that he carried for "protection." The gun had six bullets in it that day.

Defendant admitted he shot Wallace "with everything [he] had" that night but testified he did it because he feared his life was in danger. Wallace was running at defendant, and defendant shot him in response. According to defendant, Wallace was facing him when defendant initially shot him. Defendant continued to shoot when Wallace turned around. Defendant testified he "was so scared at the time … [he] just couldn't stop" shooting. He then ran from the scene to his mother's house because he "didn't want further conflict." He threw the gun toward a drain on the way.

Defendant testified he did not trust the police and had a general fear of them. He recalled giving a statement to the police about the night Wallace was shot. He conceded he did not immediately tell the police he was the shooter because defendant did not trust them. He believed the interviewing officer was "being manipulative" and "trying to coerce [him] into giving … testimony that he wanted." Defendant reported he lied during the interview about "[a] lot of stuff," including that he was not part of the shooting and that he exited the house before the victim. He testified he told the police he was lying about everything.

The defense also introduced testimony from witnesses detailing a past incident during which the victim in this case, Wallace, and another male approached three other males and they began to fight. During that fight, Wallace's accomplice hit an individual over the head with a scooter, resulting in the individual's ultimate death. Wallace was convicted of voluntary manslaughter under an aiding and abetting theory in connection

6.

with the incident. One of the witnesses also testified about a past incident during which he saw Wallace breaking into and taking items out of the witness's roommate's truck. According to the witness, Wallace attempted to hit him with a cane when he confronted him, and then Wallace returned to the property with several individuals wanting to have a physical confrontation.

## III. Rebuttal

In rebuttal, the prosecutor introduced the video and audio recording of the police interview with defendant on August 26, 2013, after the shooting.

## IV. Verdict and sentencing

The jury convicted defendant of first degree murder in violation of section 187, subdivision (a) and found true the allegation he personally discharged a firearm causing great bodily injury and death in violation of section 12022.53, subdivision (d). The court sentenced defendant to an indeterminate term of 25 years to life plus an additional 25 years to life for the firearm enhancement to be served consecutively.

## DISCUSSION

## I. The Court did not Err in Admitting Gang-Related Evidence

First, defendant argues the court erred in admitting gang-related evidence because it was irrelevant and more prejudicial than probative.

### A. Relevant Procedural History

Before trial, defendant moved to exclude any evidence regarding whether he was a member or associate of a criminal street gang and/or that any of his friends were members or associates of a criminal street gang. He argued he was not charged with being a member of a criminal street gang and admitting such evidence would result in undue prejudice and bias in the minds of the jury.

The prosecutor acknowledged there were no gang allegations in the case and she was not trying to prove defendant was a gang member. However, she asserted certain

gang evidence was relevant because "the individuals at the party are going to give their lay opinion that [defendant] and his friends were gang members" based on "how they were acting." The prosecutor asserted the witnesses would say "[p]eople were leaving the party because of the uncomfortableness and uneasiness of the gang members present at the party." The prosecutor suggested the court "give a limiting instruction" explaining the jury "heard lay opinions of who was present at the party," but "[w]e are not saying that [defendant] is an actual validated gang member nor are [there gang allegations] in this case, but the witnesses described them based upon their perception."

Defense counsel again objected on relevance and Evidence Code section 352 grounds asserting it would "inflame the passions of the jury to mention 'gang members' " and the jury would be "less inclined to give [defendant] a fair trial." He argued the witnesses were not qualified to opine regarding whether or not individuals were gang members. He further asserted the perceptions of lay witnesses other than the victim were not relevant to the case. The court overruled defendant's objection and held admissible the anticipated testimony as it was represented by the prosecutor that individuals at the party "looked like gangsters."

During trial, the court held a conference outside the presence of the jury after the prosecutor asked Wallace's cousin, Mark, what he was wearing on the night of the shooting and defense counsel objected on relevance grounds. The prosecutor explained she intended her question to elicit testimony Mark was wearing a hat that had the letters "TC" on it. She argued the people standing outside asked Mark if he was "a home boy," and he said, "no." The court noted, "[o]bviously TC would mean in and of itself Tulare County," "which is reference to a Norteño street gang," though jurors would not be aware. The prosecutor responded Mark would say it was a Minnesota Twins hat.

Defense counsel reiterated his objection on relevance grounds and also objected on Evidence Code section 352 grounds. He argued Mark could not identify defendant as a member of the group that directed the question toward him and "there's no relevance to

8.

an unknown group asking [Mark] this in relation to the murder between [defendant] and [Wallace]." He further argued the probative value of such evidence did not outweigh its prejudicial effect because the jurors would infer defendant is a gang member and want to find him guilty on that basis when there was no evidence defendant was a part of the group questioning Mark.

The court held it would allow Mark to testify about what he was wearing. Mark proceeded to testify he was wearing a Minnesota Twins hat that individuals outside the house asked him about. Mark testified he felt uncomfortable as a result of the question.

During his direct examination of defendant, defense counsel asked defendant about his statement to the police after the shooting. The prosecutor objected on hearsay grounds, and defense counsel argued defendant's prior statements were admissible as prior inconsistent and prior consistent statements once the foundation had been laid. The court noted defendant's statement to police was "obviously inconsistent" given defendant's testimony that he had lied; the court also confirmed the statement was a party admission and defense counsel agreed. The parties also agreed defendant's testimony had opened the door for the prosecutor to question him regarding his prior police contacts, but defense counsel reserved the right to make an Evidence Code section 352 argument regarding their admission.

Defendant testified regarding a prior "bad experience" he had with a police officer during which defendant denied being a gang member. The prosecutor then argued the testimony opened the door for her to introduce defendant's subsequent admission to the police after the charged shooting that he was a Northerner because such a statement "goes to impeachment." She argued defendant's testimony, in which he recounted denying he was a gang member to an officer during a prior encounter, was inconsistent with defendant's statement to police in this case in which he admitted he was a Northerner. The court agreed defendant's admission to police regarding his gang status in his statement after the charged shooting was inconsistent with his testimony and, thus,

9.

admissible. Defense counsel argued, even then, the probative value of such evidence did not substantially outweigh its potential for prejudice. He asserted if the court allowed the prosecutor to ask defendant about this statement, it would make the case appear to be a gang case although it was not. The court overruled defense counsel's objection and held the prosecutor could ask defendant about the statement he gave to the police after Wallace's shooting.

Finally, before the prosecutor introduced defendant's recorded statement to police, defense counsel objected pursuant to Evidence Code section 352 and asked the court to sanitize portions of defendant's statement. He explained, during the interview, the officers referred to defendant as being with his "homeboys, as well as asking him his affiliation with any criminal street gangs." Defense counsel asserted the court initially ruled it would exclude references to gangs, including defendant's alleged affiliation, but it subsequently permitted the prosecutor to question defendant regarding his inconsistent statements about being a Northerner. Defendant objected to the referenced statements in defendant's police interview on relevance grounds asserting such evidence was not relevant to the charges in this case. He further argued, continually allowing or eliciting "testimony about [defendant's] statements about being … a Northerner or being associated with northern gang member [*sic*] is highly prejudicial."

The prosecutor argued defendant testified and opened the door to the admission of the entirety of his statement to police—including his statement that he was a Northerner, the only gang member at the party, and a question regarding the names of his "homeboys"—because defendant testified he lied throughout the interview. Defense counsel denied defendant raised the issue of being a Northerner and, irrespective, asserted the probative value of defendant saying he was a Northerner and the only gang member at the party did not outweigh its prejudicial effect nor was it relevant to the charges. Rather, such statements only served "to inflame the passions of the jury to find

10.

[defendant] guilty because he's a gang member." Defense counsel asked the court to sanitize the recorded statement and related transcript accordingly.

The prosecutor responded the video was highly relevant and defendant raised the question of the officers' conduct throughout the entire interview by testifying they were being "manipulative." She asserted "[r]edacting any portion would make it so we could not show the video and only the audio." The prosecutor further noted defendant already testified he was a Northerner, so the video would not result in additional prejudice.

The court stated both counsel had access to defendant's interview with police prior to trial and no motions in limine were raised regarding sanitizing his statement. Defense counsel disagreed. The court went on to note defendant raised the issue of the manner in which the statement was taken and how the officers treated him during the interview. The court then held the entire interview to be admissible.

### B.      *Standard of Review and Applicable Law*

Evidence is admissible only if it is relevant. (Evid. Code, § 350.) All relevant evidence is admissible except as otherwise provided by a statutory or constitutional exclusionary rule. (See Cal. Const., art. I, § 28, subd. (f)(2); Evid. Code, § 351.) Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The general test of relevance " 'is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Bivert* (2011) 52 Cal.4th 96, 116–117.)

A court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is

11.

outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Id*. at p. 1124, italics in original; accord, *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.)

Defendant has the burden on appeal to establish an abuse of discretion.  (See *People v. Hendricks* (1988) 44 Cal.3d 635, 646.)  "[S]tate law error in admitting evidence is subject to the traditional *Watson*[2] test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)  Federal due process is offended only if admission of the irrelevant evidence renders the trial fundamentally unfair.  (*Ibid.*)

In cases not involving a gang enhancement, "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  "But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation … can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."  (*Ibid*.)

### C.    *Analysis*

Defendant argues the court prejudicially erred in admitting the cited testimony and gang-related evidence because it was irrelevant and more prejudicial than probative.  He argues such evidence was irrelevant because the evidence did not suggest gangs were

---

**2**      *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

involved in the charged incident, nor were there any gang-related allegations. He further contends such evidence was far more prejudicial than probative "because the testimony told the jury that [defendant] was a gang member and inferentially provided the jury with an improper motive for the murder." Finally, defendant asserts the challenged evidence "allowed the jury to disregard the defense theory for improper reasons." Defendant specifically challenges the lay opinion testimony of Alberto and Amy that the males at the party were gang members, the admission of Mark's testimony regarding what he was wearing on the night of the shooting and that the bystander's comment made him uncomfortable, and defendant's admission that he was a Northerner, as irrelevant to the charged crimes.

The People respond Alberto's and Amy's testimonies were "relevant to establish [defendant's] motive for murder and [Amy's] reluctance to testify and it was minimally prejudicial." The People further argue Mark's challenged testimony regarding his hat was not "gang-related" evidence; thus, it was not error to admit it. Finally, they assert, defendant's admission regarding his gang membership was relevant to attack his credibility because he initially denied gang membership at trial. They also argue such evidence was relevant to establish his motive to kill Wallace and, in any event, was harmless.

We cannot conclude the trial court abused its broad discretion in admitting the challenged evidence. First, with regard to Alberto's and Amy's testimony discussing their perception of the individuals at the party, we conclude such evidence was relevant to a disputed issue at trial—the circumstances that led up to the shooting, including motive. Here, both Alberto and Amy testified they and other partygoers were uncomfortable based on their perception that some of the attendees were gang members. And Mark's testimony further gave context to the environment leading up to the shooting. Thus, such evidence was directly relevant to the circumstances that motivated the ultimate shooting. (See *People v. Duong* (2020) 10 Cal.5th 36, 63–65 [though no

13.

gang allegations were charged, gang evidence was relevant to give "context to the shooting" and explained "defendant's willingness to shoot a complete stranger minutes after a verbal spat"].) Such evidence did not have to be dispositive of the disputed fact in order to be admissible. (See *id.* at p. 65; *People v. Richardson* (2008) 43 Cal.4th 959, 1003.) Additionally, we cannot conclude such evidence was more prejudicial than probative. Rather, neither Alberto, Amy, nor Mark singled defendant out as a gang member. Instead, they broadly discussed a group of individuals at the party and the environment in the house, providing context for the subsequent shooting.

Furthermore, under Evidence Code section 780, a "jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing." By taking the stand to testify, a defendant places his own credibility at issue and becomes subject to impeachment in the same manner as any other witness. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139.)

Here, during direct examination, defendant discussed a prior "bad experience" he had with police during which he was approached by an officer who asked him if he was a gang member; defendant denied gang membership in response. The court held such testimony opened the door for the prosecutor to introduce defendant's subsequent admission that he was a "Northerner" in his interview with police related to the shooting as a prior inconsistent statement.

We cannot conclude the court abused its discretion in determining defendant's admission regarding his gang status was relevant to a disputed issue at trial—defendant's credibility—and inconsistent with his testimony such that it was admissible to impeach him. (See Evid. Code, § 780 [evidence relevant to credibility of witness includes "any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony" including prior inconsistent statements].) Indeed, defendant's credibility was a central issue to this case. His testimony provided the basis for his defense theory—that

14.

he acted in self-defense—and the jury was tasked with accepting or rejecting defendant's version of the events that took place on the night of the shooting. The prosecutor was entitled to probe defendant's testimony in detail and the scope of cross-examination was broad. (See Evid. Code, § 780, subd. (i) [trial court may admit otherwise inadmissible evidence for impeachment purposes to prove or disprove the "existence or nonexistence of any fact" about which a witness has testified or opened the door]; accord, *People v. Dykes* (2009) 46 Cal.4th 731, 764 ["When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad."].) Additionally, defendant testified he denied gang membership to police in a prior encounter though he subsequently admitted to police in his statement following the shooting that he was a Northerner.

The trial court could reasonably conclude defendant's representation in front of the jury that he previously denied gang membership was inconsistent with his subsequent admission he was a Northerner in his statement to police after the shooting. (See *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 343 [court did not abuse its discretion in admitting evidence of defendant's admission of gang membership on a specific occasion to impeach his denial at trial that he had admitted gang membership and that his gang membership had ended earlier].) Additionally, defendant's contention that his denial of gang membership at an earlier point in time was not inconsistent with his later representation of gang membership thereby prohibiting its admissibility is without merit. (See generally *People v. Williams* (1997) 16 Cal.4th 153, 250 [evidence defendant terminated gang membership goes to weight not admissibility of gang evidence subsequently seized from his bedroom].)

We further conclude the probative value of the referenced evidence was not outweighed by its potential for prejudice. Here, as discussed, the challenged evidence tended to reflect on defendant's credibility, a central issue in the case; thus, it had "more than minimal probative value." And, given the limited nature of the admitted evidence

15.

and the relevance to the charged crimes, we cannot conclude the probative value of such evidence outweighed its potential for prejudice. (See *People v. Duong*, *supra*, 10 Cal.5th at p. 64 [gang evidence was not more prejudicial than probative where it was limited to testimony regarding people's affiliations, no gang expert testified, and there was no evidence of any other gang-related activity].)

Defendant's reliance upon *People v. Albarran* (2007) 149 Cal.App.4th 214 to support a contrary conclusion is misplaced. In *Albarran*, a jury convicted the defendant of attempted murder, shooting at an inhabited dwelling, and three counts of attempted kidnapping for carjacking, and it found true allegations the charges were committed for the benefit of a criminal street gang. (*Id.* at p. 217.) The trial court granted the defendant's motion for new trial, holding insufficient evidence supported the gang allegations given the lack of evidence linking a gang to the crime. (*Ibid*.) The court, however, denied the motion for new trial as to the underlying charges, finding the gang evidence was relevant to issues of intent. (*Ibid*.) The appellate court reversed and held the defendant was entitled to a new trial on all of the charges because the gang evidence "was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt" such that it rendered the defendant's trial "fundamentally unfair." (*Id.* at pp. 228, 232.) The *Albarran* court noted "[e]vidence of Albarran's gang involvement, standing alone, was sufficient proof of gang motive"; however, the admission of lengthy, detailed "[e]vidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia had little or no bearing on any other material issue relating to Albarran's guilt on the charged crimes and approached being classified as overkill." (*Id*. at p. 228.) The *Albarran* court held, "[g]iven the nature and amount of this gang evidence at issue, the number of witnesses who testified to Albarran's gang affiliations and the role the gang evidence played in the prosecutor's

16.

arguments, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict." (*Id*. at p. 232.)

Unlike in *Albarran*, here, the trial court admitted limited gang evidence to provide context for the charged crime and to impeach defendant's credibility. The court did not permit, and the People did not seek to introduce, extensive, graphic evidence of gang activity that was unrelated to the instant offenses. *Albarran* is inapposite.

Accordingly, we find no abuse of discretion and reject defendant's contention.

## II. Defendant was not Prejudiced by Instruction on Adoptive Admissions

Defendant next asserts the court prejudicially erred in instructing the jury with CALCRIM No. 357 regarding adoptive admissions because the instruction was not supported by the evidence and was harmful to defendant.

### A. *Procedural History*

During the jury instruction conference, the court noted its intent to give CALCRIM No. 357 on adoptive admissions. Defense counsel argued the instruction did not apply. The court and the prosecutor asserted the instruction could apply to defendant's Mirandized out-of-court statement. Defense counsel objected stating, "I don't believe he made any adopted admissions in his recordings, in his confession." The court noted defendant "admitted he possessed a firearm" and that "he fired a firearm." Defense counsel responded, "that's not an adopted admission. That's him admitting." Defense counsel further argued, "an adopted admission is if I say did you do this and you don't deny it and you like s[hr]ug your shoulders. That's an adopted admission. You could have denied it but you didn't. It doesn't apply." The following exchange took place before the court ruled it planned to give the instruction:

> "[PROSECUTOR]:I think it -- the defendantsaid he told the officers he lied but he didn't actuallytell the officers he lied.Okay, come on, we don't believe you, you don't know who you're with and things.

"[DEFENSE COUNSEL]:He gave affirmative statements.Adoptive statements is about conduct whether or not youdenied it or not.He denied everything.

"THE COURT:Okay.But what the instruction does is speaking of something that goes to the juryobviously.It discusses the elements of [*sic*] before considering it and then the instruction says if you decide that all these requirements have been met you may conclude that the defendant admitted the statement wastrue.If you decide any of these requirements have not been met you must not consider either the statement or the defendant's response for any purpose.

"Okay, so there's an in and there's an out,okay.They can consider it they can make a finding itdoesn't apply.

"[DEFENSE COUNSEL]:If you're ruling to accept it Ijust note my objection.

"THE COURT:  Okay, I'm going to go ahead and give it."

## B.  Standard of Review

Instructional errors are questions of law, which we review de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218; accord, *People v. Cole* (2004) 33 Cal.4th 1158, 1210.) We must ascertain the relevant law and determine whether the given instruction correctly stated it.  (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526.)  If error is found under state law, it is assessed for prejudice using the standard described in *Watson*, the question being whether the defendant has demonstrated a reasonable probability he would have obtained a more favorable result had the error not occurred.  (*People v. Moore* (2011) 51 Cal.4th 1104, 1130.)  The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner."  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

Heightened scrutiny is applied when evaluating errors that infringe upon a party's due process rights, e.g., the use of jury instructions that relieve the prosecution of its burden to prove each element of the charged offense beyond a reasonable doubt.  (See

18.

*People v. Flood* (1998) 18 Cal.4th 470, 491, 502–503.)  Such errors are considered prejudicial unless the reviewing court determines "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

### C.    Applicable Law

Pursuant to Evidence Code section 1221, "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."  The statute "contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence or equivocal or evasive conduct."  (*People v. Combs* (2004) 34 Cal.4th 821, 843.)  Under this provision, " 'If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' "  (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

CALCRIM No. 357 instructs the jury regarding adoptive admissions, providing:

> "If you conclude that someone made a statement outside of court that (accused the defendant of the crime/ [or] tended to connect the defendant with the commission of the crime) and the defendant did not deny it, you must decide whether each of the following is true:
>
> > "1.    The statement was made to the defendant or made in (his/her) presence;
> >
> > "2.    The defendant heard and understood the statement;
> >
> > "3.    The defendant would, under all the circumstances, naturally have denied the statement if (he/she) thought it was not true;

"AND

"4.     The defendant could have denied it but did not.

"If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.

"If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

### D.     Analysis

Defendant argues the court erred in instructing the jury with CALCRIM No. 357 because he did not make any adoptive admissions; thus, there was no basis for this instruction. He asserts the error implicated his due process rights and, thus, reversal is required because it cannot be shown the error was harmless beyond a reasonable doubt. He further contends, even if the error is not deemed one of constitutional dimension, there is a reasonable probability the result of his trial would have been more favorable if the court had not instructed the jury with CALCRIM No. 357; accordingly, reversal is still required. He asserts the instruction lessened the prosecution's burden of proof and permitted conviction on insufficient evidence because it "directed and allowed the jury to dissect every word uttered by [him] during his interview in any [*sic*] unfair light." Defendant further argues CALCRIM No. 357 "gave undue credence to the detectives' questions and opinions" and allowed the jury to reject defendant's self-defense theory. The People concede CALCRIM No. 357 was not supported by the evidence, but they argue the instruction was harmless. We agree with the People.

By its plain language, CALCRIM No. 357 instructs the jury it can only consider evidence as an adoptive admission if the record establishes certain predicate facts to support such a conclusion. (See *People v. Combs*, *supra*, 34 Cal.4th at p. 843 [noting trial court submitted to jury the question "whether defendant's conduct actually constituted an adoptive admission"].) Thus, it does no more than offer the jury a permissive inference which the jury *could* draw from the evidence. A jury instruction

20.

that "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion," does not lessen the prosecution's burden. (*Francis v. Franklin* (1985) 471 U.S. 307, 314.) Indeed, contrary to defendant's argument, the California Supreme Court has held CALJIC No. 2.71.5, the predecessor to CALCRIM No. 357 discussing adoptive admissions, has no application to the evidence, it is harmless; it does not reduce the prosecution's burden of proof. (See *People v. Chism* (2014) 58 Cal.4th 1266, 1299.)

And, here, the court further instructed the jury: "Some of these instructions may not apply depending upon your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jury followed the instructions and, as a result, disregarded CALCRIM No. 357 as inapplicable. (See *People v. Chism*, *supra*, 58 Cal.4th at p. 1299.) Accordingly, we conclude the error in instructing the jury with CALCRIM No. 357 was harmless. (*Ibid*; *Watson*, *supra*, 46 Cal.2d at p. 836.)

We reject defendant's contention.

## III. The Court did not Prejudicially Err by Instructing the Jury with CALCRIM No. 361

Defendant next contends the court abused its discretion in instructing the jury with CALCRIM No. 361 (failure to explain or deny evidence) because it was not supported by the evidence and violated defendant's rights to due process and a fair trial.

### A. *Relevant Procedural History*

The court noted its intent to instruct the jury with CALCRIM No. 361 regarding the failure to explain or deny adverse testimony. Defense counsel asked the court to "include it" because he did not intend to call defendant in surrebuttal, which would have permitted him to address adverse testimony brought up on rebuttal. The court noted,

21.

"This instruction should only be given when the defendant testifies in [*sic*] the privilege against self incrimination has not been successfully invoked. So I have to give it."

Accordingly, the court instructed the jury with CALCRIM No. 361:

> "If the defendant failed in his testimony to explain or deny evidence against him and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt.

> "If the defendant failed to explain or deny, it is up to you to decide the meaning and the importance of that failure."

### B. Applicable Law

The California Supreme Court has held CALCRIM No. 361 "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117.) "As to incriminating evidence that a testifying defendant denies or explains, there is no silence from which an inference 'may flow.' " (*Ibid*.) "Even if the defendant's testimony conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre, it is not … 'the functional equivalent of no explanation at all.' " (*Ibid*.) On the other hand, those circumstances suggest the defendant may have " 'deliberately lied about something significant,' " in which case a court may instruct jurors with CALCRIM No. 226, to " 'consider not believing anything that witness says.' " (*Ibid*.)

### C. Analysis

Defendant argues it was error for the court to instruct the jury with CALCRIM No. 361 because he was available for cross-examination and answered all of the prosecutor's questions; thus, the record did not support the instruction. He argues his

counsel erred in failing to object to the instruction, but the error should not be deemed forfeited because it affected his substantial rights, namely, his due process rights. Alternatively, he argues his counsel was ineffective in failing to object. He argues he was prejudiced because CALCRIM No. 361 shifted the burden of production and persuasion. He further contends the instruction impermissibly suggested to the jury defendant failed to explain or deny evidence against him and invited them to draw a negative inference, though he did not fail to explain or deny adverse evidence. He also argues the instruction allowed the jury to dismiss his defense because he failed to refute or deny every aspect of the prosecution's case.

The People respond, even if it was error for the court to instruct the jury with CALCRIM No. 361, any prejudicial impact of the instruction "was mitigated by the language of the instruction itself and the jury instructions as a whole." Again, we agree with the People; even if it was error to give CALCRIM No. 361, the error was harmless.

First, we agree with the People the language of CALCRIM No. 361 mitigates against prejudice by instructing the jury its application is premised upon the jury first finding defendant failed to explain or deny evidence. And, as discussed, the jury was instructed that some instructions may not apply in which case the jury should disregard them. We presume the jury followed the instructions. Thus, even assuming arguendo, CALCRIM No. 361 did not apply—that is there was no evidence defendant failed to explain or deny evidence—we presume the jury disregarded it. (*People v. Vega* (2015) 236 Cal.App.4th 484, 502–503 [jurors were instructed not all instructions were necessarily applicable " 'mitigat[ing] any prejudicial effect' " related to giving CALCRIM No. 361 if it were deemed improper].)

We also cannot conclude the challenged instruction led to an inference of guilt. (*Id.* at p. 502 ["CALCRIM No. 361 does not direct the jury to draw an adverse inference"].) Rather, it merely permits a jury to consider a failure to explain or deny incriminating evidence, noting such a failure to explain or deny *alone* is not a sufficient

23.

basis upon which to infer guilt, and it highlights the prosecution's burden to prove guilt beyond a reasonable doubt. (*Ibid.*)

Moreover, in *People v. Saddler* (1979) 24 Cal.3d 671, the California Supreme court rejected an argument that a substantially similar instruction—CALJIC No. 2.62—violated a defendant's due process rights by denying him the presumption of innocence and instead raising an inference of guilt. (*Saddler*, at pp. 679–680.) In so holding, the *Saddler* court emphasized the instruction cautions the jury that the failure of a defendant to deny or explain " 'does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of defendant beyond a reasonable doubt.' " (*Id.* at p. 680.) Similar cautionary language is included in CALCRIM No. 361, which warns that a defendant's failure to explain or deny "is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt." CALCRIM No. 361 further instructs the jury, "If the defendant failed to explain or deny, it is up to you to decide the meaning and the importance of that failure." Like the language in CALJIC No. 2.62, we conclude the cautionary language in CALCRIM No. 361 does not relieve the prosecution of its burden of proving every essential element of the crime and the guilt of defendant beyond a reasonable doubt. (See *Saddler*, at p. 680; *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066–1067.) Accordingly, we find no violation of defendant's right to due process based on this instruction and instead conclude its inclusion was harmless.[3]

We reject defendant's contention.

---

**3** Defendant also contends his counsel was ineffective for failing to object; however, because we address his claim on the merits and conclude any error in giving CALCRIM No. 361 was harmless, we need not address his ineffective assistance claim which would also require a showing of prejudice.

## IV. Cumulative Error

Defendant argues the errors committed were cumulatively prejudicial and deprived him of a fair trial. We disagree.

"Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors. [Citations.] 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216–1217.)

Here, there is no series of prejudicial errors to cumulate. Accordingly, defendant cannot demonstrate the cumulative effect of the alleged errors resulted in prejudice. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["As noted, claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate."].)

## V. Defendant Forfeited his Challenge to the Imposed Fines and Fees

Defendant next challenges the restitution fine and parole revocation fine, victim restitution, court operations fee, and criminal conviction assessment imposed at sentencing.

### A. Relevant Procedural History

At the sentencing hearing, the court ordered defendant to pay a restitution fine of $10,000 pursuant to section 1202.4, a parole revocation fine of $10,000 pursuant to section 1202.45, victim restitution pursuant to section 1202.4, subdivision (f) in the amount of $5,000, a $40 court operations fee, and a $30 criminal conviction assessment. Defense counsel did not object to the imposition of the fines and fees below.

### B. Analysis

Defendant argues the court violated his due process rights by imposing the restitution and parole revocation fines as well the $40 court operations fee (§ 1465.8) and

$30 criminal conviction assessment (Gov. Code, § 70373) without determining whether he had the present ability to pay these amounts. Defendant's due process argument is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after defendant was sentenced and while his current appeal was pending. Relying on *Dueñas*, defendant asserts the fines and fees must be stayed, and the matter remanded for the court to determine his ability to pay.[4]

Defendant concedes he did not raise his challenges below, but he argues our court can consider the issue for the first time on appeal because the imposition of the fines and fees violated his constitutional rights and *Dueñas* was a change in the law that took place after his sentencing hearing. He also argues because the imposition of the fines and fees violated due process they constitute an "unauthorized sentence." He further contends he is not precluded from raising this issue for the first time on appeal because it affects his fundamental constitutional rights to due process, equal protection, and to be free from excessive fines and fees. Finally, he contends his failure to object is excused because any objection would have been futile given the governing law at the time of sentencing.

In *Dueñas*, the defendant lost her driver's license because she was financially unable to pay her juvenile citations. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1161.) She continued to reoffend for driving with a suspended license because the aggregating criminal conviction assessments and fines prevented her from recovering her license. (*Ibid.*) The *Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty." (*Id.* at pp. 1163–1164.) The *Dueñas* court concluded the defendant faced ongoing unintended punitive consequences because of her inability to pay. (*Id*. at p. 1168.)

---

**4** The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

*Dueñas* determined those unintended consequences were "fundamentally unfair" for an indigent defendant under principles of due process. (*Ibid*.) *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before imposing court facilities and court operations assessments under section 1465.8 and Government Code section 70373. (*Id.* at pp. 1164; accord, *People v. Castellano* (2019) 33 Cal.App.5th 485, 488–489.) Additionally, although the court is required by section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate the defendant has the present ability to pay the fine. (*Duenas*, *supra*, 30 Cal.App.5th at p. 1164.)

Even if we were to assume *Dueñas* applies to this case, we conclude defendant has forfeited any challenge to his alleged inability to pay the imposed fines and fees. Here, the court ordered defendant to pay a restitution fine of $10,000, the maximum amount permitted under section 1202.4, subdivision (b). When the court imposes a restitution fine greater than the $300 statutory minimum amount, "[s]ection 1202.4 expressly contemplates an objection based on inability to pay." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*).) Accordingly, while *Dueñas* had not been decided at the time of defendant's sentencing hearing, defendant had the statutory right to object to the $10,000 restitution fine and demonstrate his alleged inability to pay, and such an objection "would not have been futile under governing law at the time of his sentencing hearing." (*Frandsen*, at pp. 1153–1154 [*Dueñas* challenge forfeited by failure to object at sentencing]; see *People v. Aguilar* (2015) 60 Cal.4th 862, 864, 868 [appellate forfeiture rule applies to various fees imposed at sentencing].) Because defendant had the statutory right to object to the imposition of the maximum restitution fine, and he failed to do so, he has forfeited his claim on appeal. We conclude that defendant's contentions regarding the assessments imposed under section 1465.8 and Government Code section 70373 are likewise forfeited. "As a practical matter, if [defendant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not

27.

complain on similar grounds regarding an additional [$70] in fees." (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.)

Furthermore, defendant's contention that his failure to object was excused because the imposed fines and fees constituted an unauthorized sentence is meritless. (See *People v. Avila* (2009) 46 Cal.4th 680, 729 [rejecting argument imposition of a restitution fine under § 1202.4 was an unauthorized sentence not subject to forfeiture rule since defendant did not have ability to pay].) As discussed, defendant could have requested an ability to pay hearing pursuant to section 1202.4 at the time of sentencing, but he failed to do so. "Had defendant brought his argument to the court's attention, it could have exercised its discretion and considered defendant's ability to pay, along with other relevant factors, in ascertaining the [restitution] fine amount." (See *People v. Avila*, at p. 729.) However, by failing to raise the issue below and introduce evidence of his ability to pay, defendant waived his argument on appeal. (*Ibid.*)

Because we conclude defendant forfeited this claim, he is not entitled to remand for a hearing on the subject. We reject defendant's contention.

## VI. Court did not Err in Refusing to Strike Defendant's Firearm Enhancement and Remand is not Required

Finally, defendant contends the court erred in refusing to strike his firearm enhancement. Alternatively, he asserts remand is necessary for the court to consider imposing a different firearm enhancement with a lesser sentence.

### A. *Relevant Procedural History*

The information charged defendant with one firearm enhancement allegation, "that a principal personally and intentionally discharged a firearm … within the meaning of Penal Code section[] 12022.53(d)." During the sentencing hearing, defense counsel urged the court to strike the firearm enhancement allegation and to sentence defendant to 25 years to life imprisonment, asserting a sentence of 50 years to life would be "tantamount to a sentence of death" to defendant "in that he would not have the

possibility of being released until he's in his late … 70's, early 80's."  The court acknowledged it had discretion to strike the 25-year-to-life firearm enhancement, but it declined to exercise its discretion to do so.  The court based its decision on the record before it, including that defendant went to a party armed and shot the victim after an alleged verbal altercation and no weapon was found on the victim.

### B.      Standard of Review and Applicable Law

Section 12022.53 sets out three different sentence enhancements for the personal use of a firearm in the commission of certain enumerated felony offenses:  (1) subdivision (b) provides for a 10-year enhancement for the personal use of a firearm; (2) subdivision (c) provides for a 20-year enhancement for the personal and intentional discharge of a firearm; and (3) subdivision (d) provides for a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death.  (*People v. Tirado* (2019) 38 Cal.App.5th 637, 642 (*Tirado*), review granted Nov. 13, 2019, S257658.)  Previously, section 12022.53, subdivision (h) prohibited trial courts from striking section 12022.53 enhancements.  (*Tirado*, at p. 642.)  However, Senate Bill No. 620 (2017-2018 Reg. Sess.), effective January 1, 2018, amended this section to give trial courts discretion to " 'strike or dismiss' " firearm enhancements imposed pursuant to section 12022.53 " 'in the interest of justice pursuant to [s]ection 1385."  (*Tirado*, at p. 642.)

The denial of a motion to dismiss pursuant to section 1385 is reviewed for abuse of discretion, and "an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss."  (*People v. Carmony* (2004) 33 Cal.4th 367, 378; *Tirado*, *supra*, 38 Cal.App.5th at p. 642.)  A trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it. (*People v. Carmony*, at p. 377.)  The trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a

29.

particular sentence will not be set aside on review absent the required showing of abuse of discretion. (*Id*. at pp. 376–377.)

### C. Analysis

Defendant asserts the court abused its discretion in refusing to strike the firearm enhancement. Alternatively, he asserts he should be entitled to a remand for a new sentencing hearing to permit the court to consider imposing a lesser sentence under section 12022.53, subdivision (b) or (c) in lieu of the term imposed under subdivision (d).

The People respond the court did not abuse its discretion and defendant forfeited his claim that the matter should be remanded for the court to consider a lesser sentence under the other provisions of 12022.53 by failing to raise the issue below. They further argue the recent amendment to section 12022.53 does not authorize the imposition of an alternative firearm enhancement.

We cannot conclude the court abused its discretion in refusing to strike the section 12022.53, subdivision (d) enhancement, nor do we agree defendant is entitled to remand. Here, the record establishes the court was aware of its discretion to strike the charged firearm enhancement and, based on the record before it evidencing that defendant arrived at the party armed and shot an unarmed victim after a verbal altercation, declined to strike the firearm enhancement. We cannot conclude the court's decision was irrational or arbitrary.

We also cannot conclude defendant is entitled to a remand for the court to consider imposing a different firearm enhancement under section 12022.53, subdivision (b) or (c). In *Tirado*, our court concluded "[n]othing in the plain language of sections 1385 and 12022.53, subdivision (h) authorizes a trial court to substitute one enhancement for another." (*Tirado*, *supra*, 38 Cal.App.5th at p. 643.) We noted the language of sections 12022.53, subdivision (h) and 1385 "indicates the court's power pursuant to these sections is binary: The court can choose to dismiss a charge or enhancement in the

interest of justice, or it can choose to take no action. There is nothing in either statute that conveys the power to change, modify, or substitute a charge or enhancement." (*Tirado*, at p. 643.) We further acknowledged if the prosecution had alleged all three section 12022.53 enhancements and the jury had found them all true, the court would then have had the discretion to strike the section 12022.53, subdivision (d) enhancement and either impose one of the other two enhancements or strike them as well. (*Tirado*, at p. 644.) However, because there, as here, the People exercised their charging discretion to allege only one enhancement, the trial court was limited to either imposing or striking that enhancement. (*Ibid*.)

In so holding, our court expressly disagreed with *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), a decision by our sister court, which defendant relies upon in support of his argument he should be entitled to remand on this basis.[5] Although

---

[5] In *Morrison*, the defendant was sentenced to prison for 50 years to life—25 years to life on the murder count and 25 years to life for the firearm enhancement. (*Morrison*, *supra*, 34 Cal.App.5th at p. 220.) The defendant filed a request to recall the sentence pursuant to section 1170, subdivision (d)(1), based on recent amendments to section 12022.53 that gave the court the discretion, effective January 1, 2018, to strike the firearm enhancement under its provisions. (*Morrison*, at p. 220.) The court held a hearing, in which it recalled the sentence but denied the request to strike the firearm enhancement. (*Ibid*.) In a subsequent hearing, the court reimposed the original sentence of 50 years to life, consisting of 25 years to life for the murder count and 25 years to life for the firearm enhancement. (*Ibid*.) On appeal, the defendant argued the case should be remanded for resentencing because the court did not understand the scope of its discretion. (*Ibid*.) He acknowledged that the trial court acted properly in declining to strike the enhancement completely. (*Id*. at p. 221.) But he argued the court had the discretion to modify the enhancement from that established by section 12022.53, subdivision (d), which carries a term of 25 years to life, to a "lesser included" enhancement under section 12022.53, subdivision (b) or (c), which carry lesser terms of 10 years or 20 years, respectively. (*Ibid*.)

The First District held "the court could impose an uncharged enhancement under section 12022.53, subdivision (b) or (c) in lieu of an enhancement under section 12022.53, subdivision (d) if it was unsupported by substantial evidence or was defective or legally inapplicable in some other respect." (*Morrison*, *supra*, 34 Cal.App.5th at p. 222.) It reasoned, accordingly, there was "no reason a court could not also impose one

we recognize review has been granted, we see no reason to depart from our analysis and conclusion in *Tirado*. Defendant is not entitled to a remand to permit the trial court to exercise its discretion to impose an enhancement under section 12022.53 that carries a lower sentence, when no such enhancement was alleged.

We reject defendant's final contention.

### DISPOSITION

We affirm the judgment.

DE SANTOS, J.

WE CONCUR:

HILL, P.J.

PEÑA, J.

---

of these enhancements after striking an enhancement under section 12022.53, subdivision (d), under section 1385." (*Id*. at pp. 222–223.) The court rejected the People's argument that it was clear from the court's comments it would not exercise its discretion to impose an enhancement under section 12022.53, subdivision (b) or (c) instead of a lifetime enhancement under section 12022.53, subdivision (d) in the interests of justice. (*Morrison*, at p. 223.) The First District held "[a]lthough the court stated adequate reasons for declining to strike the lifetime enhancement under section 12022.53, subdivision (d), the record does not reflect whether it understood that it could impose a lesser enhancement under section 12022.53, subdivision (b) or (c) instead." (*Id*. at pp. 223–224.)